**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **Marina Kaplan,** | **Case No. 1:24-cv-01500-PAB** |
| **Plaintiff,** | |
| **-vs-** | |
| | **JUDGE PAMELA A. BARKER** |
| **Advanz Pharma Corp., et al.,** | |
| **Defendants.** | **MEMORANDUM OPINION & ORDER** |

Currently pending before the Court is Defendants Advanz Pharma Corp. ("Advanz"), Pinnacle Biologics, Inc. ("Pinnacle"), and Concordia Pharmaceuticals, Inc.'s ("Concordia") Motion for Summary Judgment ("Defendants' Motion"). (Doc. No. 34.) Plaintiff Marina Kaplan ("Kaplan") filed her Opposition on January 19, 2026, to which Defendants replied on February 2, 2026. (Doc. Nos. 38, 40.) On February 2, 2026, Defendants also filed a Motion to Strike the Declaration of Milan Dubravka (the "Motion to Strike"). (Doc. No. 41.) Kaplan filed her Opposition to the Motion to Strike on February 15, 2026, to which Defendants replied on February 22, 2026. (Doc. Nos. 42, 43.)

For the reasons set forth below, the Court rules as follows. The Motion to Strike is granted in part and denied in part as follows. The Court strikes Paragraph 30 of Dubravka's Declaration and denies the Motion to Strike in all other respects. Defendants' Motion is granted in part and denied in part as follows. The Court grants summary judgment in favor of Concordia on all of Plaintiff's claims against it. The Court grants summary judgment in favor of Advanz and Pinnacle on Plaintiff's sex discrimination claims and wrongful discharge claim. The Court denies summary judgment in favor of Advanz and Pinnacle on Plaintiff's age discrimination claims and national origin/religious discrimination claims.

## I.      Factual Background

Kaplan is a female, who was born in 1962, and is of Ukrainian and Jewish descent.  (Doc. No. 23, ¶¶ 13–14.)  On January 16, 2023, Kaplan began her employment with Defendants as a RBM (e.g. a salesperson).  (Kaplan Dep. 96:23–97:1.)  When Kaplan started her employment, she reported to Milan Dubravka ("Dubravka").  (*Id.* at 101:2–11.)  Dubravka, in turn, reported to Larry Miles ("Miles"), the general manager of Pinnacle. (Doc. No. 38-10, ¶ 4.) Kaplan was assigned to the "Pittsburgh" territory.  (Dubravka Dep. 130:21–132:9.)

### A.      Kaplan is responsible for selling PHOTOFRIN® and receives training on her role with Defendants

RBMs are responsible for the sale of PHOTOFRIN® to physicians and hospitals. PHOTOFRIN® is a photosensitizing agent, and it is used in tandem with Photodynamic Light Therapy ("PDT") to treat certain cancers.  (Dubravka Dep. 121:25–124:1.)  Physicians typically administer PDT treatments in three separate illuminations, usually occurring over a two- to three-day period.  (Dubravka Dep. 169:20–170:7.)  RBMs were also responsible for educating physicians and their staff about procedure. (Dubravka Dep. 21:23–22:7.)  In addition to education, RBMs participate in the PDT procedure by calibrating the laser for the physician.  (Kaplan Dep. 99:18–22; Dubravka Dep. 123:9–13, 212:15–23.)

As part of the onboarding process, Kaplan received training on these aspects of her job. Dubravka provided one-on-one training to Plaintiff and Plaintiff attended the PHOTOFRIN® with PDT training from January 24 to January 27, 2023.  (Dubravka Dep. 155:13–158:2; Kaplan Dep. 102:12-103:3, 104:10-17.)  She also observed Dubravka perform PDT illuminations at the University of Illinois.  (Dubravka Dep. 162:22-165:14, 169:10-170:20.)  After the formal training ended, Plaintiff continued to observe Dubravka perform PDT illuminations in the field.  (Kaplan Dep.

147:24–148:24.)

## B.    Kaplan has some issues with her first cases

On March 3, 2023, Kaplan attended her first independent PDT procedure at Virginia Commonwealth University ("VCU").  (Kaplan Dep. 448:12–450:22, 455:20–25.)  Kaplan struggled with her first procedure, and facetimed Dubravka to obtain his assistance with the procedure. (*Id.* at 204:22–207:13, 211:2–9.)   After the procedure, the attending doctor, Dr. Shepherd, emailed Dubravka concerning his dissatisfaction with Kaplan:

> . . . our team is very disappointed in the support we had for the case and this was an extremely frustrating experience for all of us involved.  Clearly she was not adequately trained or prepared and basic issues could not be dealt with.  This was the worst industry support I have experienced in 20 years of dozens of procedural technologies.  It was unacceptable and could have affected patient safety.  Your company knows that it should send an experienced support staff to a new site or site that has not done this procedure in a long time.  There were other issues as well . . . but those were minor compared to the actual procedure support.

(Doc. No. 39-2, PageID #2521.)   Dubravka responded that he agreed that Kaplan was "not experienced enough to support your case" and "[t]he plan was that I would assist her, but unfortunately the timing of your case conflicted with PDT Academy I ran yesterday in Montana." (*Id.* at PageID #2519–20.)

Dubravka believes that "[t]he difficulty during this case was not attributable to Ms. Kaplan or her abilities."  (Doc. No. 38-10 at ¶ 21.)  Based on communications with Dr. Shepherd, Dubravka believes that "[n]othing Ms. Kaplan did or said created any compliance issue that was reported to the Company."  (*Id.*)  And Dr. Shepherd "did not report to [him] anything about Ms. Kaplan's attitude . . . , safety violations, or being banned from VCU."  (*Id.*)

A week after the VCU case, Durbavka sent an email criticizing Kaplan for the way she handled certain communications with another client (UPMC):

3

> OK, so you sent the email, fain (sic).
>
> But that's not where your job ends, do you understand that, Marina?
>
> Do you understand that you actually chase the answer down until you know. Until you know for certain they have/have not the kits. Get a phone number, call her, confirm, send a follow up email, go down there in person, whatever it takes.
> AT THE END OF THE DAY IT IS YOUR RESPONISBILITY THAT EVERYTHING IS READY FOR THESE CASES.
>
> FOR A SECOND DON'T YOU PUT ANY RESPONSIBILITY ON ALLYSON OR ANY OTHER CLINICAL SUPPORT TECH BECAUSE ITS NOT THEIR JOB! BY THE WAY, AFTER THIS HICCUP (*SIC*), WE HAVE SOME FIXING TO DO.   I NEED YOU TO BE IN THE CASE NEXT WEEK. ALL ILLUMINATION SESSIONS. I NEED YOU TO MEET WITH DR AWAIS, I| NEED YOU TO MEET HIS TEAM. VICTORIA, MARIE (who saved us today), INFUSION TEAM, ALL OF THEM. IF YOU HAVE THE KITS, BRING SOME WITH YOU.
>
> Part of the problem is you didn't establish any relationship with the team, they don't know who you are. This is why the communication is broken, and this is why we didn't address and handle the kits shortage situation timely.

(Doc. No. 35-16, PageID #848.) This was not the only criticism that Dubravka gave to Kaplan about her work at UPMC.  Months later, in October 2023, Dubravka again emailed Kaplan explaining his dissatisfaction with how she had communicated with UPMC:

> Do me a favor please:  Never ever again go to a doctor and be an inconvenience to him/her by asking to reschedule a case.  Moving forward, if you have a legitimate reason NOT TO BE IN A CASE ON A WEEKDAY, you go either to me or Jacque and request a case coverage.  It is me or Jacque who will make sure to send someone there to cover your case.  It's only when we COLLECTIVELY cannot find coverage for you that you would go to the doctor to see if there is a chance to reschedule it.
>
> * * *
>
> Marina, I need you to understand one thing.  As a NSM, I will do anything to keep my number 1 account in good standings (sic).  This means I will not hesitate for a second to take that account away from you and assign it someone else, if you cannot accommodate/service that account.

4

(Doc. No. 35-18, PageID #859–60.)

### C.        Kaplan reports her personal concerns with "off-label cases"

In August 2023, Kaplan complained to Miles in-person about her personal apprehension about being involved with "off-label" cases.[1]   She told Miles "I should not be involved in those communications."  (Kaplan Dep. 388:9–15.)  She brought up her personal concerns again in October 2023 during a one-on-one call with Miles.  (Kaplan Dep. 347:25–348:3.)  She told Miles "I cannot continue being involved in this . . . [t]his needs to stop."  (*Id.*)

### D.        Defendants investigate Kaplan's performance

At around the same time, Miles began hearing "rumors" that "there [were] issues in the Pittsburgh territory with Marina [Kaplan]." (Miles Dep. 211:1–212:1.)  He also heard that "she hung up on her counterparts and peers in the middle of phone calls more than once," that "she was rude to the office staff . . . in her customers' offices," and that "she would not share information with her teammates."  (Miles Dep. 214:14–215:2.)

A month later, in November 2023, Dubravka and Defendants decided to part ways.  (Miller Dep. 53:5–24.)  Terry Miller ("Miller") was hired to take over Dubravka's role.  (*Id.*)  Dubravka stayed on with Defendants until December 2023 to help with the transition.  (*Id.*)

When Miller took over Dubravka's role in November 2023, Miles "told him the situation [that] was going on with Marina [Kaplan]" based on "the facts as [he] [understood] them."  (Miles Dep. 260:5–10.)[2]  For example, Miles told Miller that Kaplan had been banned from UPMC.  (Miller Dep. 40:24–41:1.)  Also, at a "high level," Miles told Miller that there was "an episode that had happened during national training" and that Kaplan "elected to not engage in a lot of the conversations

---

[1] Federal law mandates certain restrictions on the marketing of "off-label" uses of FDA-approved drugs.
[2] Miles also told Miller during this interview that "there were issues in one of the territories."  (Miller Dep. 22:21–22.)

that they had as far as sharing of information and tactics and best practices."  (Miller Dep. 41:6–20.)  Miles instructed Miller to "dig into it" and "make an assessment."  (Miles Dep. 260:11–15.)

After completing his investigation, Miller emailed Miles and requested that "we terminate her ASAP!"  (Doc. No. 38-7, PageID #1169.)  Miller wrote that "[l]eaving her in the territory can be creating increased long-term damage."  (*Id.*)  He based this statement on "a list of multiple specific points (documentation) of unacceptable actions/behavior/feedback on Marina [Kaplan]."  (*Id.*)  This "documentation" included "notes from Jacque Tarlton" and "two previous case experiences Tara Lake RBM, had, when covering Marina [Kaplan]."  (*Id.* at PageID #1170.)  Nothing in Miller's email pertains to Kaplan's relationship with UPMC.

Tarlton's notes detailed that (i) Lori Marshal (another employee) refused to cover cases for Kaplan "because she is difficult to deal with and extremely rude," (ii) Brainna Carlson (another employee) informed Tarlton that "the staff [at West Penn] told her that Marina is not allowed in West Penn," (iii)  Tarlton believed that Kaplan "was not a team player" based on his one-on-one call with her, and (iv) Tarlton heard from "multiple RMBs . . . that [Kaplan] is aggressive and not a team player."  (*Id.* at PageID #1170.)  Lake's experiences included (i) a case at VCU where the "compliance team was present," and the staff informed Lake that Kaplan "did not handle the equipment properly" and "was unprofessional and rude," and (ii) a case at West Penn where two fellows "expressed their lack of education from the in-service given by Marina [Kaplan], a doctor made a comment "we are not fond of her and would rather not work with her," and they "were also displeased that Marina [Kaplan] suggested a proctorship with a rival hospital in the area."  (*Id.*)

Although not memorialized in his email to Miles, Miller also based his decision to terminate Kaplan on her declining sales numbers.  (Miller  Dep. 105:7–11).  Although Kaplan's sales were

declining in the second half of 2023, other RBMs, however, had similar sales problems in the second half of 2023.  (Doc. No. 39–2, PageID #2533–2537.)  Miller was aware that "the majority [of RBMs] were trending down."  (Miller Dep. 45:1–46:3.)

> **E.  Miles decides to terminate Kaplan's employment**

Upon receiving Miller's report, on December 28, 2023, Miles emailed HR that he "would like to move forward with a plan to terminate Marina [Kaplan]."  (Doc. No. 38-7, PageID #1169.)  On January 12, 2024, Kaplan was terminated from her employment.  (Doc. No. 23, ¶ 36.)

## II.  Procedural History

On July 12, 2024, Kaplan initiated this civil action by filing her Complaint in state court. (Doc. No. 1-2.)  On September 3, 2024, Defendants removed this matter to this Court.  (Doc. No. 1.) On September 24, 2024, Kaplan filed her First Amended Complaint.  (Doc. No. 8.)  Then on April 8, 2025, Kaplan filed her Second Amended Complaint, which is the operative complaint.  (Doc. No. 20.)  Therein, Kaplan brings claims for age discrimination, sex discrimination, religious and national origin discrimination, and wrongful discharge in violation of public policy.  (*Id.*)

After the close of discovery, on December 17, 2025, Defendants filed their Motion for Summary Judgment.  (Doc. No. 34.)  Kaplan filed her Opposition on January 19, 2026, to which Defendants replied on February 2, 2026.  (Doc. Nos. 38, 40.)  On February 2, 2026, Defendants also filed the Motion to Strike.  (Doc. No. 41.)  Kaplan filed her Opposition to the Motion to Strike on February 15, 2026, to which Defendants replied on February 22, 2026.  (Doc. Nos. 42, 43.) Accordingly, the Motion for Summary Judgment and Motion to Strike are ripe for review.

## III.  Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A

dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487. At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508–09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F.Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*,

8

53 F.3d at 150).

IV.     **Analysis**

     A.     **The Court grants in part and denies in part the Motion to Strike**

Before turning to the merits of Defendants' Motion, the Court first addresses Defendants' Motion to Strike.  Therein, Defendants argue that several averments in Dubravka's Declaration (Doc. No. 38-10) contradict his deposition testimony.

The Sixth Circuit has repeatedly indicated that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). In determining an affidavit's admissibility at summary judgment, courts must first consider "whether the affidavit 'directly contradicts the nonmoving party's prior sworn testimony,'" and, "[i]f so, absent a persuasive justification for the contradiction, the court should not consider the affidavit." *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019) (citation omitted). Sixth Circuit precedent suggests "a relatively narrow definition of contradiction." *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006). If a party "was not directly questioned about an issue," a later affidavit on that issue simply "fills a gap left open by the moving party." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006).

Before turning to whether Dubravka's affidavit contradicts his deposition testimony under these standards, the Court first addresses Kaplan's legal arguments.  Kaplan argues that "[t]his rule is entirely inapplicable to the Dubravka Declaration" because (1) "he is not a party," and (2) "Dubravka's deposition testimony was solicited after his Declaration." (Doc. No. 42, PageID #4772.) Defendants respond in their Reply that "Courts within this Circuit uniformly invoke the [sham affidavit doctrine] to weed out declarations that contradict deposition testimony – whether that live

9

testimony pre- or post-dates the declaration."  (Doc. No. 43, PageID #4779.)  Defendants further argue that "[n]or does Dubravka's non-party status render the [sham affidavit doctrine] inapplicable or the Declaration admissible."  (*Id.* at PageID #4780.)

The Court disagrees with Kaplan.  First, courts in this Circuit have applied the "sham affidavit" rule to non-party witnesses.  *See Peck v. Bridgeport Machs., Inc.*, 237 F.3d 614, 619 (6th Cir. 2001) (contradictory affidavit of expert witness excluded on summary judgment);  *Vill. of Walton Hills ex rel. HGE Concrete Supply Company, LLC v. Vill. of Walton Hills*, No. 1:20-cv-01772, 2023 U.S. Dist. LEXIS 16535, at *13 (N.D. Ohio Jan. 31, 2023) (declining to consider potions of a third-party witness affidavit under the sham affidavit rule); *Stafford v. Sanford, L.P.*, No. 4:06-cv-35,  2007 U.S. Dist. LEXIS 48745, at *6 (E.D. Tenn. July 3, 2007) ("Accordingly, the directly contradictory portions of [the non-party's] affidavit, as outlined above, will be ignored by the Court"); *K&D Distribs., Ltd. v. Aston Group (Mich.), Inc.*, 225 F.R.D. 550, 552 (N.D. Ohio 2005) ("a party cannot offer a witness's affidavit that contradicts that witness's prior testimony").

Second, although the Sixth Circuit has not addressed the situation here, at least three other Courts of Appeals have held that the "sham affidavit" rule applies even when deposition testimony contradicts a *prior* declaration.  *Hacienda Records, L.P. v. Ramos*, 718 F. App'x 223, 235 (5th Cir. 2018) ("Ramos' suggestion that only an affidavit that comes after testimony can be a sham is misguided"); *In re Citx Corp.*, 448 F.3d 672, 679 (3d Cir. 2006) ("We perceive no principle that cabins sham affidavits to a particular sequence"); *Darnell v. Target Stores*, 16 F.3d 174, 177 (7th Cir. 1994) (applying the sham affidavit rule to affidavits that were contradicted by subsequent deposition testimony).  But district courts in this Circuit have reached varying conclusions on this issue. *Compare Rizka v. State Farm Fire & Cas. Co.*, No. 13-cv-14870, 2015 U.S. Dist. LEXIS 171076, at

10

*20, n.6 (E.D. Mich. Dec. 23, 2015) ("And while this rule most often applies to affidavits submitted *after* a party's deposition, it applies with equal force to sworn statements made *before* a party's deposition that are directly contradicted by later deposition testimony"); *Partin v. Telxon Corp.*, No. C-1-98-503, 2001 U.S. Dist. LEXIS 25181, at *9 (S.D. Ohio June 25, 2001) (following *Darnell* and refusing to consider affidavit because "Mr. Striegel's later deposition testimony contradicts his earlier affidavit"); *with Berkshire v. Dahl*, No. 12-12038, 2017 U.S. Dist. LEXIS 121625, at *56, n.3 (E.D. Mich. Mar. 3, 2017) (declining to apply the sham affidavit rule to a pre-deposition declaration).[3] The Court believes that the Sixth Circuit would likely follow its sister Courts of Appeals, and find that the sham affidavit rule applies to an affidavit executed prior to the affiant's deposition.

Having rejected Kaplan's legal arguments, the Court next addresses whether Dubravka's Declaration "directly contradicts" his deposition testimony.

### 1. The Court declines to strike Paragraphs 8 and 27 of Dubravka's Declaration

In their Motion to Strike, Defendants assert that Dubravka's averments that "Ms. Kaplan was the best performing RBM at the Company during her employment" and that "[a]ny claim that she was endangering customer relationships is nonsense and false" are contracted by his "deposition testimony and physical evidence." (Doc. No. 41-1, PageID #4656.) According to Defendants, he

---

[3] In accordance with the available Court of Appeals case law, the majority of district courts outside of this Circuit hold that the sham affidavit rule applies even if the affidavit preceded the affiant's deposition. *See Webb v. Zimmer, Inc.*, No. 2:14-cv-01106 (ADS)(GRB), 2019 U.S. Dist. LEXIS 17584, at *21 (E.D.N.Y. Feb. 4, 2019) (adopting the reasoning of *Hacienda* and *CitX*); *Glass v. Lahood*, 786 F. Supp. 2d 189, 216 (D.D.C. 2011) ("The peculiar twist in this case is that, in contrast to the typical sequence of events, the contradictory affidavit upon which Glass relies *preceded* her deposition in time. But the timing of the affidavit is inconsequential"); *AB v. Rhinebeck Cent. Sch. Dist.*, 361 F. Supp. 2d 312, 316, n.4 (S.D.N.Y. 2005) ("Although, in this case, the graduation incident was not alleged *for the first time* in KL's affidavit, the court does not understand the Second Circuit to be indicating that deposition testimony can be rejected by contradictory allegations whenever the "first time" condition is not met, i.e. simply because the allegations were made before the testimony was given").

"admitted he wrote an email to Plaintiff on October 27, 2023 in response to her failure to follow a customer's express communication directives." (*Id.*)  And they assert that a document allegedly shows "RBM Jill Jedd sold the greatest number of vials in 2023." (*Id.*)

In response, Kaplan argues that "Dubravka's subsequent deposition testimony confirmed" Paragraph 8 because he testified '[s]he was my best employee. I would call her exemplary employee.'" (Doc. No. 42, PageID #4773.)  With respect to Paragraph 27, Kaplan argues that "Defendants asked Dubravka about this, and he testified clearly that Jedd was at 116% of goal, while Kaplan was at 126% percent of goal." (*Id.* at PageID #4773–74.)

In their Reply, Defendants assert that "Dubravka admitted he authored an October 27, 2023 email to Plaintiff (i) criticizing Plaintiff's communication style and her failure to adhere to a physician's directives, going so far as to admonish her he "will not hesitate for a second to take that account away from you and assign it to someone else, if you cannot accommodate/service that account" and (ii) further directing her to "[n]ever ever again go to a doctor and be an inconvenience to him/her by asking to reschedule a case." (Doc. No. 43, PageID #4781.)

The Court finds that Dubravka's averment that "Ms. Kaplan was the best performing RBM at the Company during her employment" is not contradicted by his deposition testimony.  As Kaplan correctly points out, Dubravka testified that Kaplan "was my best employee" and that he would call her an "exemplary employee." (Dubravka Dep. 26:17–22.)  Further, Kaplan correctly points out that Dubravka testified that Kaplan was at "126 percent of her number," whereas "Jill was at 116 percent." (Dubravka Dep. 304:7–8.)  Although Dubravka may have criticized Kaplan's performance at times, he believed Kaplan was his best employee.  There is nothing contradictory about an employer criticizing an employee's work even when that employee is the "best."  The Court therefore declines

to strike Dubravka's averment that "Ms. Kaplan was the best performing RBM at the Company during her employment."

The Court also finds that Dubravka's averment of "[a]ny claim that she was endangering customer relationships is nonsense and false" is not contradicted by his deposition testimony. Although he did send an email to Kaplan advising her that "I will not hesitate for a second to take that account away from you and assign it to someone else, if you cannot accommodate/service that account," Dubravka testified that this email was a "great example of coaching" and to teach her the "specifics to that account." (Dubravka Dep. 240:4–6.) The Court finds that this email is consistent with Dubravka's Declaration. If Dubravka believed that Kaplan was indeed endangering customer relationships, he would not have given her a second chance to keep the account. Although the email is blunt, the Court finds that it could be construed as "coaching" as Dubravka testified.

In sum, the Court declines to strike Dubravka's averments that "Ms. Kaplan was the best performing RBM at the Company during her employment" and that "[a]ny claim that she was endangering customer relationships is nonsense and false."

### 2.   The Court declines to strike Paragraph 9 of Dubravka's Declaration

In their Motion to Strike, Defendants assert that Dubravka's averment that "Ms. Kaplan inherited a Pittsburgh territory that was vacant for a few months," is contradicted by Dubravka's testimony where he "admitted the Pittsburgh territory was one of Pinnacle's strongest immediately preceding Plaintiff's hire and further admits the University of Pittsburgh Medical Center [within the Pittsburgh territory] was Pinnacle's largest client at that time." (Doc. No. 41-1, PageID #4657.) Kaplan responds that "Dubravka confirmed at deposition that the territory was vacant for two and one-half to three months" and that "Defendants' citation to testimony about Pittsburgh being a busy

13

territory and UPMC being a large client is a *non sequitur*, and no contradiction exists on this topic." (Doc. No. 42, PageID #4774.)   In their Reply, Defendants argue that "Dubravka's deposition testimony and Declaration are riddled with inconsistencies regarding the Pittsburgh territory's status preceding Plaintiff's hire."  (Doc. No. 43, PageID #4785.)  According to Defendants, "Dubravka admitted: (i) the Pittsburgh territory was one of Pinnacle's strongest immediately preceding Plaintiff's hire and (ii) the University of Pittsburgh Medical Center [within the Pittsburgh territory] was Pinnacle's largest client at that time." (*Id.*)

The Court agrees with Kaplan.  A territory can be vacant while remaining high performing. For example, the record (including Dubravka's testimony) is replete with examples of RBMs working outside of their territory and covering cases for other RBMs.  The Court therefore declines to strike Dubravka's averment that "Ms. Kaplan inherited a Pittsburgh territory that was vacant for a few months."

### 3.    The Court declines to strike Paragraphs 11, 12, and 13 of Dubravka's Declaration

In their Motion to Strike, Defendants assert that the following averments are contradicted by Dubravka' testimony (1) "RBMs work alone. The job is an individual one . . . The Company and I did not expect the RBMs or any combination of RBMs to work as a 'team' to market or sell within any territory," (2) "[t]he Company did not evaluate RBMs on their 'teamwork' or relationships with other RBMs or Company employees," and (3) "[e]ven though there was no expectation of teamwork between RBMs . . . ."  (Doc. No. 41-1, PageID #4657.)  Defendants assert that in his Declaration, "Dubravka also states '[t]he RBMs and I held weekly sales team meetings by videoconference using Microsoft,' which "belies Dubravka's claim there is no team component to the RBMs' role."  (*Id.*) Then Defendants assert that "Dubravka admitted he wrote an email to the Regional Business

14

Managers ('RBMs') on August 2, 2023 stating, in relevant part: "This might sound crazy but sales is a team sport; we all have to do our part to collectively achieve the goal!" (*Id.*)

Kaplan argues in response that "Defendants' citation of Dubravka's emails about 'sales team meetings' and 'sales is a team sport' borders on silliness."  (Doc. No. 42, PageID #4774.)   Kaplan asserts that "RBMs were all members of the sales 'team' and they had 'team meetings,' but this naming convention does not contradict Dubravka's specific testimony that RBMs perform their sales duties individually and are not evaluated on any team component."  (*Id.*)

In their Reply, Defendants argue that "Plaintiff disregards Dubravka's August 2, 2023 email, wherein he unequivocally described sales '[a]s a team sport; we all have to do our part to collectively achieve the goal!'"  (Doc. No. 43, PageID #4784.)  Defendants assert that "Dubravka admitted he authored that email" and that "Plaintiff cannot temper this admission and the undisputed physical evidence by name-calling Defendants and couching Dubravka's email as a simple 'naming convention.'"  (Doc. No. 43, PageID #4784.)

The Court agrees with Kaplan.  The Court finds that Dubravka could refer to the RBMs informally as a "team," while also asserting that there was no formal expectation that the RBMs work together as a "team" and that "teamwork" was not part of how RBMs were evaluated.  Further, Dubravka's August 2, 2023, email does not contradict his Declaraion.  When viewing that email in its full context, Dubravka was pushing the RBMs to sell more vials of Photofrin to reach the company's overall sales goals.  Dubravka was not suggesting that the RBMs assist each other in selling vials within their respective territories.  The Court therefore declines to strike Paragraphs 11, 12 and 13 of Dubravka's Declaration.

### 4. The Court declines to strike Paragraphs 17 and 18 of Dubravka's Declaration

In their Motion to Strike, Defendants next argue that the following averments are contradicted by Dubravka's deposition testimony: "Ms. Kaplan was never 'banned' from, barred from, uninvited from, disinvited from, or otherwise requested to avoid any hospital or medical facility by any customer or potential customer of the Company," and "Ms. Kaplan had no customer relationship issues with any physician customer or potential customer of the Company." Defendants argue that "Dubravka admitted Dr. Wes Shepherd's March 4, 2023 email correspondence to Dubravka, which described the 'unacceptable' and 'worst industry support [Dr. Shepherd] experienced in 20 years of dozens of procedural technologies' that also 'could have affected patient safety' was 'about an experience with Marina [Kaplan].'" (Doc. No. 41-1, PageID #4657–58.) They then assert that "[a]t Dr. Shepherd's request, another RBM (i.e., not Plaintiff) attended the subsequent procedures." (*Id.* at PageID #4658.) Defendants then point to two emails sent by Dubravka where he (1) cautioned Kaplan that he "will not hesitate for a second to take that account away from you and assign it to someone else, if you cannot accommodate/service that account" and (2) directed Kaplan to "[n]ever ever again go to a doctor and be an inconvenience to him/her by asking to reschedule a case." (*Id.* at PageID #4658.)

Kaplan argues that Dubravka "confirmed [Paragraph 17] at his subsequent deposition" and that "Defendants do not cite any record evidence from Dubravka or any other source, that shows Dubravka's Declaration to be false." (Doc. No. 42, PageID #4775.) In their Reply, Defendants assert that "Dubravka admitted Dr. Wes Shepherd's March 4, 2023 email correspondence to Dubravka" and that "the March 4 Email makes clear Plaintiff was no longer welcome at VCU." (Doc. No. 43, PageID #4782.)

16

The Court declines to strike Paragraph 17.  Dubravka confirmed in his deposition that Kaplan was never banned from any hospitals.  (Dubravka Dep. 318:16–17.)  The emails cited by Defendants do not contradict this testimony.  First, there is nothing in Dr. Shepherd's March 4, 2023 email that suggest Kaplan was banned from VCU.  (Doc. No. 41-6.)  Second, there is nothing in Dubravka's October 27, 2023 email suggesting that Kaplan was banned from UPMC.  (Doc. No. 41-3.)  Indeed, if Dubravka believed Kaplan had been banned from UPMC, he would not have said that he would "not hesitate for a second to take that account away from you and assign it to someone else, if you cannot accommodate/service that account."  If she were banned, Dubravka would have simply taken her off the account.

Also, the Court will not strike Paragraph 18.  The phrase "[n]o customer relationship issues" is a broad phrase that implies that Kaplan did not have long term relationship issues with her customers, such that she would not be able to service those accounts.  The emails Defendants rely upon merely indicate, at worst, two incidents where Kaplan made a mistake.  Indeed, Dubravka testified that Dr. Awais (of UPMC) told him that "I have nothing against Marina [Kaplan].  There's no issues there."  (Dubravka Dep. 317:1–2.)  And Defendants have not pointed to any testimony by Dubravka where he specifically testified that Kaplan had long term issues with customers.  The Court, therefore, finds that Paragraph 18 is not directly contradicted by Dubravka's deposition testimony.

**5.      The Court declines to strike Paragraph 21 of the Declaration**

Defendants next argue that Paragraph 21 ("The difficulty during this case [with Dr. Shepherd] was not attributable to Ms. Kaplan or her abilities") is contradicted by Dubravka's testimony.  (Doc. No. 41-1, PageID #4658.)  They assert that "Dubravka admitted Dr. Wes Shepherd's March 4, 2023 email correspondence to Dubravka, which described the 'unacceptable' and 'worst industry support

17

[Dr. Shepherd] experienced in 20 years of dozens of procedural technologies' that also 'could have affected patient safety' was 'about an experience with Marina [Kaplan].'" (*Id.*) Kaplan responds that Dubravka confirmed Paragraph 21 in his deposition by testifying that "Marina was not ready to cover it…. I missed the target there. I thought she was ready to go. But I also thought we're going to be able to FaceTime her during that procedure. . .. That resource was not available to her. So I feel like we failed her. I don't think any other rep would do better if they were in the field on a job for one month and they were supporting a case with a brand-new account." (Doc. No. 42, PageID #4775.) Defendants assert in their Reply that "Dubravka admitted the March 4 Email was 'about an experience with Marina [Kaplan].'" (Doc. No. 43, PageID #4783.)

Again, the Court agrees with Kaplan. Dubravka testified: "I really think . . . it came down to us failing the rep. She clearly was not ready to cover the case on her own." (Dubravka Dep. 190:4–7.) He further testified, as Kaplan correctly points out, that "Marina was not ready to cover it" and that he felt "like we failed her." (*Id.* at 194:1:–10.) His testimony is therefore consistent with his averment that "[t]he difficulty during this case [with Dr. Shepherd] was not attributable to Ms. Kaplan or her abilities." The Court therefore will not strike Paragraph 21.

### 6.    The Court declines to strike Paragraph 22 of Dubravka's Declaration

Defendants that assert that Paragraph 22 ("This situation [with Dr. Shepherd] was not unique to Ms. Kaplan. Every RBM had his or her share of failed cases or cases that involved equipment issues or difficult interactions with hospital staff") contradicts Dubravka's deposition because he "was unable to provide any such example." (Doc. No. 41-1, PageID #4648.) Kaplan argues in Opposition that Dubravka "testified at his deposition that he could not recall specific examples" and that "[h]e also testified at deposition that if he had access to all his 2023 emails, he would find

18

examples." (Doc. No. 42, PageID #4775.) Defendants argue in their Reply that "Dubravka admitted he did not review the March 4 Email memorializing the VCU Incident until presented with the Email at his deposition (i.e., over two years after he received it from Dr. Shepherd), yet he readily recalled the VCU Incident with Plaintiff." (Doc. No. 43, PageID #4783.) According to Defendants, "Dubravka did not need to review his email traffic to recount Dr. Shepherd's complaints regarding Plaintiff." (*Id.*)

Failing to recall specific examples of an event does not make a statement contradictory. Taken to its extreme, this argument would mean that a statement that "it rained in June" would be "contradictory" if the speaker could not recall which day it rained in June. These statements are obviously not contradictory. Dubravka's inability to recall specific examples certainty goes to his credibility, but it does not make his averment contradictory. The Court declines to strike Paragraph 22.

**7.      The Court declines to strike Paragraph 27 of Dubravka's Declaration**

Defendants ask this Court to strike Paragraph 27, which reads that "[t]here was no legitimate business reason to terminate Ms. Kaplan's employment related to her sales performance, her conduct as a Company employee, or her relationships with her customers or her peers . . . ." Defendants assert that Dubravka "could only speculate about why Pinnacle terminated Plaintiff" by pointing to the following testimony:

> I think – and again, it's very speculative, but I'm trying to still understand why Marina was let go. And I think it comes down to she perhaps was [an] inconvenience because she was calling on some questionable actions taken by the leadership, but also she didn't quite fit the profile. And so, you know, could that be it? Because I have no other reason. . . . You try to make sense out of some of that, and I know it's very speculative, but again, I'm trying to understand why Marina was let go –

(Doc. No. 41-1, citing Dubravka Dep. 320:4–321:13.)

Kaplan argues that the statements Defendants' point to are not contradictory.  (Doc. No. 42, PageID #4775 ("Defendants compare Dubravka's Declaration testimony that no legitimate business reason existed to terminate her employment . . . with his deposition testimony that he could think of no reason to terminate her.").)   In their Reply, Defendants argues that "Plaintiff omits critical context from Dubravka's deposition to reconcile its discrepancies with his Declaration. On one hand (i.e., in his Declaration), Dubravka asserts there was no legitimate business reason to terminate Plaintiff, and on the other hand (i.e., in his deposition), he repeatedly and admittedly 'speculate[s]' about the termination decision."  (Doc. No. 43, PageID #4784.)

The Court also declines to strike Paragraph 27.  Dubravka "speculating" about why Kaplan was terminated is consistent with his statement that there "was no legitimate business reason to terminate Ms. Kaplan's employment."  In other words, Dubravka could not think of a legitimate reason why Kaplan's employment was terminated but that is not inconsistent with his thoughts about why she was actually terminated.  He could not know the actual reason for her termination since he was no longer working for Defendants when Kaplan was terminated.  Put simply, the statements Defendants point to do not contradict Paragraph 27 of Dubravka's Declaration.

**8.     The Court strikes Paragraph 30 of Dubravka's Declaration**

Defendants next assert that Paragraph 30 ("During my tenure with the Company, I am aware of Mr. Miles ending employment of only two employees in the sales group and they are Ms. Kaplan and me") contradicts Dubravka's deposition testimony because he "called his separation from Pinnacle 'voluntary.'" (Doc. No. 41-1, PageID #4659.)  According to Kaplan, Dubravka "testified at deposition that he thought the separation was 'BS,' but he also thought, 'just move on,' and he and

20

the Company 'agreed on separation terms.'"  (Doc. No. 42, PageID #4775.)  Defendants argue in their Reply that "Plaintiff simply ignores Dubravka's unequivocal testimony calling the separation 'voluntary.'"  (Doc. No. 43, PageID #4784.)  The Court agrees with Defendants.  Miles did not end Dubravka's employment.  Dubravka testified that his decision to leave Pinnacle was voluntary.  Thus, the Court strikes Paragraph 30.

**B.**    **The Court grants, in part and denies, in part, Defendants' Motion for Summary Judgment**

The Court next turns to Defendants' Motion.  The Court first addresses Defendants' arguments that they are not joint/single employers of Kaplan.  Then, the Court addresses whether Defendants are entitled to summary judgment on Kaplan's specific claims.

**1.**    **Defendant Concordia is entitled to summary judgment**

Defendants argue that "Pinnacle alone was Plaintiff's employer" and that "[t]here is no evidence Pinnacle, Advanz, Advanz US[4] and Concordia operated as a single or joint employer enterprise."  (Doc. No. 34-1, PageID #640.)  In her Opposition, Kaplan asserts that she "does not oppose Defendant Concordia's motion for summary judgment on the grounds that it was not Kaplan's employer with Advanz and Pinnacle."  (Doc. No. 38, PageID #917.)  In their Reply, Defendants argue that "Plaintiff abandons her claims against Concordia, and Concordia is entitled to summary judgment on this basis alone."  (Doc. No. 40, PageID #4119.)  The Court agrees.  Based on Kaplan's explicit concession, the Court enters summary judgment in Defendant Concordia's favor on all of Kaplan's claims.  *Hupp v. CSX Transp., Inc.*, No. 5:21-CV-00968, 2023 U.S. Dist. LEXIS 96042, at *10 (N.D.

---

[4] Although "Advanz US" is not named as a defendant, Defendants assert that "[t]here is no Advanz entity named Advanz Pharma Corp., the named Defendant in this lawsuit" and "[b]ecause the Advanz entity named in this lawsuit does not exist, Defendants move for summary judgment as to both Advanz US and Advanz. For purposes of this Argument, "Advanz" encompasses Advanz US.  (Doc. No. 34-1, PageID #626, 638.)

Ohio May 31, 2023) (Barker, J.); *Dickman v. Kent*, No. 1:19-cv-01638, 2022 U.S. Dist. LEXIS 106276, at *16 (N.D. Ohio June 14, 2022) (Barker, J.).

### 2. Plaintiff has waived any opposition to Advanz and Pinnacle's argument that they were not joint employers

Advanz and Pinnacle correctly asserted in their Reply that "Plaintiff also does not dispute the lack of a joint employment relationship" and therefore, Plaintiff has "waived any argument invoking its existence."  (Doc. No. 40, PageID #4119.)  The Court agrees.  Accordingly, the Court finds that Kaplan has waived any argument that Advanz and Pinnacle are her joint employer. *DG Gas, LLC v. TA Franchise Sys*. LLC, No. 1:24-cv-01002-PAB, 2025 U.S. Dist. LEXIS 47159, at *81 (N.D. Ohio Mar. 14, 2025) (Barker, J.); *Adam v. Nakhle*, No. 1:22CV2183, 2023 U.S. Dist. LEXIS 206028, at *70–71 at *23 (N.D. Ohio Nov. 17, 2023) (Barker, J.); *Coles v. Johnny Appleseed Broad. Co.*, 479 F. Supp.3d 585, 603 (N.D. Ohio 2020) (Barker, J.).

### 3. Advanz and Pinnacle are not entitled to summary judgment on the issue of whether they are a single employer

With respect to their single employer argument, Defendants argue that "the record easily and undisputedly dispels an interrelation of operations among Defendants" because (i) "Pinnacle, Advanz US, Advanz and Concordia operate independently and autonomously" and (ii) "each entity has its own board of directors and enters into commercial contracts in its own name."  (Doc. No. 34-1, PageID #640–41.)  Defendants then argue that "Defendants maintain separate and independent management structures" which "summarily dooms single employment status."  (*Id.* at PageID #641.)  Defendants next argue that "Pinnacle alone directs its employees' day-to-day activities and delegates their work assignments; supervises employees' performance; dictates terms of employment, including but not limited to compensation and benefits; and compensates its employees."  (*Id.*)  They also assert that "Pinnacle alone is empowered to hire, fire and discipline the RBMs."  (*Id.*)  Finally,

22

they assert that "common ownership is moot, as there is no evidence any Defendants is a sham entity." (*Id.* at PageID #642.)

Kaplan responds that (i) "Pinnacle's central functions are performed by Advanz," (ii) "Pinnacle does not have its own accounting or finance department; those functions are performed at Advanz," (iii) "Pinnacle and Advanz have the same office space in Bannockburn, Illinois," (iv) "Pinnacle's payroll was run by Advanz," and (v) "Miles reported to the Chief Commercial Officer at Advanz" and his email is "lmiles@advanzpharma.com." (Doc. No. 38, PageID #928–29.)  Kaplan also argues that "Advanz and Pinnacle share common ownership, as Pinnacle is owned by Advanz." (*Id.* at PageID #929.)  Kaplan also argues that "[t]he greatest integration is in employee and personnel management" because (i) "Pinnacle has no human resources, but relies upon Advanz, (ii) Miles has regular meetings with . . . Advanz employees," (iii) "Miles consults with both for 'anything that might be a human resources-related issue,'" (iv) "Miles confirmed Advanz approves all hires and terminations, including Kaplan's," (v) "Miles testified that the HR functions are 'integrated,'" (vi) "Kaplan was trained on both Pinnacle and Advanz Pharma."  (*Id.*)

In their Reply, Defendants maintain that "[i]t is undisputed each Defendant (i) conducts its business independently; (ii) enters into commercial contracts in its own name; (iii) has its own board of directors and retains autonomous authority over its strategic, commercial, operational, and day-to-day decision-making; and (iv) maintains separate and independent record keeping, financial records and bank accounts."  (Doc. No. 40, PageID #4115.)  They also argue that "it is unrefuted Advanz, Advanz US, and Pinnacle employ distinct management and corporate executives."  (*Id.*)  Defendants finally argue that "Pinnacle has the unilateral and ultimate control and power to hire, fire and discipline the RBMs and the Company independently directs its employees' day-to-day activities and

23

delegates their work assignments; supervises employees' performance; dictates terms of employment, including but not limited to, compensation and benefits; and compensates its employees." (*Id.* at PageID #4116.)

Upon consideration of the parties' arguments, the Court finds that whether Advanz and Pinnacle are single-employers is a jury question. "Under the single-employer doctrine, 'two nominally independent entities are so interrelated' that all of the employees of one are attributed to the other." *Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011) (quoting *Swallows v. Barnes & Noble Book Stores*, 128 F.3d 990, 993, n.4 (6th Cir. 1997)). "In determining whether to treat two entities as a single employer, courts examine the following four factors: (1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control." *Swallows*, 128 F.3d at 993–94 (citing *York v. Tennessee Crushed Stone Asso.*, 684 F.2d 360, 362 (6th Cir. 1982)). None of the factors are conclusive, but the third factor is the "central concern." *Id.* at 994.

Because the third factor is the "central concern,' the Court begins its analysis there. Miles testified that he has "never hired anyone without . . . making sure that HR did approve." (Miles Dep. 33:24–34:2.) And it was Miles' "practice to inform Advanz Pharma human resources and obtain their input and counsel before making a final termination decision." (Miles Dep. 34:17–21.) Moreover, Miles considered Pinnacle and Advanz to be integrated with respect to "human resources, oversight and support, personnel management, performance management, and personnel decisions." (*Id.* at 36:19–37:1.) Further, "payroll questions" are "answered by someone who worked for Advanz

24

Pharma." (*Id.* at 29:7–11.)  Miles additionally testified that he consults Advanz for "human resources' support," including "personnel issues," "training, development [and] those types of things."  (*Id.* at 29:15–32:2; 33:1–4.)  Based on Miles testimony, the Court finds that a jury could find that Pinnacle and Advanz had a centralized control of labor relations and personnel.  *Bloomer v. Word Network Operating Co.*, 785 F. Supp. 3d 251, 263 (E.D. Mich. 2025) (denying summary judgment when one defendant had "the authority to hire and fire the employees and independent contractors at both [defendant] entities").

There are also some facts supporting the "interrelation of operations" factor.  Miles testified that Advanz "provide[s] accounting and finance support to Pinnacle" because Pinnacle does not have its own accounting and finance departments.  (Miles Dep. 35:1–16.)  Defendants also do not dispute that they share the same office space in Bannockburn, Illinois.  *EEOC v. R&L Carries, Inc.*, 664 F. Supp. 3d 784, 798 (S.D. Ohio 2023) ("when two entities set forth a shared principal address ... [it] shows there may be common or interrelated aspects to their operations") (cleaned up).  And although Defendants have their own board of directors and bank accounts, "Advanz US, Concordia and Pinnacle utilize certain centralized back-office support services provided by Advanz and may follow certain Advanz group-level policies and procedures that apply among all Advanz entities."  (Doc. No. 35-1, ¶¶ 8–9.)

The Court gives the "common management" factor little weight.  The only evidence Plaintiff points to is that Miles has an "advanzpharma" email and that he reports to the COO at Advanz.  The fourth factor also does not support Plaintiff's claim of a single enterprise. The Sixth Circuit has found that "[i]f neither of the entities is a sham then the fourth test is not met."  *Swallows*, 128 F.3d at 995 (quoting *EEOC v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.3d 566, 572 (6th Cir. 1984)).

25

Thus, even if one defendant "is a wholly owned subsidiary of [another] defendant," this factor is not met. *Divney v. Penske Auto. Grp., Inc.*, No. 1:15 CV 2358, 2016 U.S. Dist. LEXIS 127243, at *14 (N.D. Ohio Sept. 19, 2016). Because there is no evidence that any of the Defendants are a sham, this factor is not met. But this factor is not dispositive. *Bloomer*, 785 F. Supp. 3d at 263.

On balance, given the evidence supporting the third factor, which is the "central concern," the Court finds that there is a genuine dispute of material fact as to whether Pinnacle and Advanz operated as a single employer. Having found that there is a triable issue as to whether Defendants operated as a single employer, the Court next analyzes whether Pinnacle and Advanz are entitled to summary judgment on Kaplan's specific claims against them.

### 4. Pinnacle and Advanz are not entitled to summary judgment on Plaintiff's age discrimination claims

"An employee can establish an age discrimination case by either direct or circumstantial evidence." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008). Here, Kaplan relies on circumstantial evidence of age discrimination. Claims relying on indirect evidence of age discrimination are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020); *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014). Under that framework, the plaintiff must first produce "'evidence from which a reasonable jury could conclude that he or she established a *prima facie* case of discrimination' before the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action." *Willard*, 952 F.3d at 807 (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)). The plaintiff must then rebut the proffered reason by producing "evidence from [] which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id.*; *see also Provenzano v. LCI Holdings,*

26

*Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  As the has Sixth Circuit explained:

> As we have clarified before, the *McDonnell Douglas* burden-shifting framework allocates "the burden of production and [provides] an order for the presentation of proof in [employment discrimination] cases." *Provenzano*, 663 F.3d at 812 (last alteration in original) (emphasis added) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 659 (6th Cir. 2000)). Thus, at the first stage of the burden-shifting framework, we do not ask whether a jury could conclude that the plaintiff has proven its *prima facie* case by preponderant evidence, but rather whether "a reasonable jury could conclude that a *prima facie* case of discrimination has been established." *Provenzano,* 663 F.3d at 812 (quoting *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007)).  At the pretext stage, the plaintiff's burden of production "merges" with his ultimate burden of persuasion to show that age discrimination was the but-for cause of his termination. *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

*Willard*, 952 F.3d at 807.

The Court will examine each stage, in turn, below.

### i.    Plaintiff can establish a prime facie case of age discrimination

To establish a *prima facie* case of age discrimination, a plaintiff must show that (1) she was a member of a protected class (older than 40 years old); (2) she suffered an adverse employment action; (3) she was qualified for the position held; and (4) she was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably.  *See Pelcha v. MW Bancorp., Inc.,* 988 F.3d 318, 326 (6th Cir. 2021); *Geiger v. Tower Auto.*, 579 F.3d 614, 622–23 (6th Cir. 2009).

Establishing a *prima facie* case of age discrimination is a "light burden [that] is 'easily met' and 'not onerous.'"  *Pelcha*, 988 F.3d at 326 (quoting *Willard*, 952 F.3d at 808 (6th Cir. 2020).  "[T]his light review must be distinguished from the more rigorous comparison conducted at the later stages" of the analysis.  *Provenzano*, 663 F.3d at 814.  "The sole function of the prima facie stage of

27

the burden-shifting framework is to raise a rebuttable presumption of discrimination by eliminating the most common nondiscriminatory reasons for the employer's treatment of the plaintiff, such as the plaintiff is unqualified for the position or not a member of the protected group." *Willard*, 952 F.3d at 808 (quoting *Cline*, 206 F.3d at 660) (internal quotation marks and alterations omitted).  It is "not meant to stymie plaintiffs, but simply serves to bring the litigants and the court expeditiously and fairly to the ultimate question." *Cline*, 206 F.3d at 660 (internal quotation marks omitted); *see also Willard*, 952 F.3d at 808.

In their Motion for Summary Judgment, Defendants argue that Plaintiff cannot establish a prime facie age discrimination case because (1) she was ill-qualified for the RBM role, and (2) Plaintiff cannot identify a comparator whom Defendants treated more favorably.  The Court addresses each argument in turn below.

### a. There is a genuine dispute of material fact as to whether Kaplan was qualified for the RBM role

Defendants argue that Kaplan's prima facie case fails because "she was unequivocally unqualified for the RBM Role."  (Doc. No. 34-1, PageID #646.)  Defendants argue that:

> Plaintiff's inadequate PDT support, subpar in-service trainings, insubordination, rudeness and failure to follow directives marred her Pinnacle tenure, drawing the ire of physicians, their staffs and Dubravka. (SMF, pp. 9-13). In March 2023 – nearly two months after Plaintiff completed her PDT Training and field training regimens – Plaintiff provided "unacceptable" support for a first PDT illumination at VCU, prompting the treating physician to communicate his "disappoint[ment]" and request a different RBM attend the second and third illuminations. The physician further explained Plaintiff's inadequate PDT support – which he described as the "worst industry support [he] [] experienced in 20 years of dozens of procedural technologies" – compromised patient safety. For this reason, VCU required its Compliance Team to attend the second illumination, an occurrence Plaintiff conceded was an aberration. Thereafter, and as Plaintiff admits, Plaintiff never returned to VCU, and the hospital did not purchase PHOTOFRIN® from Pinnacle. (SMF, p. 10).

Plaintiff's performance deficiencies persisted. Months later, in October 2023, Plaintiff failed to comply with PDT scheduling protocol as well as repeated directives from UPMC, Pinnacle's then-largest account. In response, Dubravka admonished Plaintiff he would "not hesitate for a second to take that account away from [Plaintiff] and assign it to someone else, if [Plaintiff] cannot accommodate/service that account." (SMF, p. 12).

Moreover, in December 2023, West Penn Hospital twice complained about Plaintiff, citing her inappropriate communication style and rude and negative demeanor, attributes which damaged the hospital's view of and relationship with Pinnacle. (SMF, p. 13). Plaintiff's steep decline in sales, on the heels of West Penn's, VCU's, UPMC's and Dubravka's complaints, cement Plaintiff's lack of qualifications for the RBM Role. (SMF, pp. 9-13).

(*Id.* at PageID #646–47.)

In her Opposition, Kaplan argues that "Defendants conflate their alleged stated reason for terminating Kaplan, i.e., their baseless performance criticisms of Kaplan, with Kaplan's prima facie burden to demonstrate that she was qualified for the job." (Doc. No. 38, PageID #931.)  Pointing to *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003), Kaplan asserts that "[t]he Sixth Circuit soundly rejects this approach, having held, 'a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was a pretext designed to mask discrimination.'" (*Id.*)  And, according to Kaplan, "Defendants admit she was qualified for [the] job." (*Id.*)

In their Reply, Defendants attempt to distinguish *Wexler*.  They assert that "Plaintiff relies upon *Wexler* to discredit her persistent performance shortcomings, but she fundamentally misunderstands *Wexler* and, if anything, the decision solidifies Plaintiff's ill-qualifications for the RBM Role" because "*Wexler* emphasizes at the prima facie stage, the salient inquiry is Plaintiff's

objective qualifications for the RBM Role." (Doc. No. 40, PageID #4121.)

Simply put, Defendants are incorrect. In *Wexler*, the Sixth Circuit held (in an en banc decision) that "[a]t the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." 317 F.3d at 575. The *Wexler* court explained that "[a]lthough the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id.* at 576. Interpreting *Wexler*, the Sixth Circuit has "repeatedly cautioned district courts against 'consider[ing] the employer's alleged nondiscriminatory reason when analyzing the prima facie case.'" *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) (holding district court erred "by focusing on the hospital's proffered reason for terminating Loyd rather than on Loyd's objective qualifications for the security—guard position in evaluating her prima facie case"); *see also Spicer v. Harv. Maint., Inc.*, No. 25-1667, 2026 U.S. App. LEXIS 12750, at *9–10 (6th Cir. May 1, 2026) ("In doing so, the district court pointed to Harvard's evidence of Spicer's performance problems and her major rules violations . . . But this kind of analysis conflates the qualification prong with the employer's nondiscriminatory reasons justifying a plaintiff's termination").

Here, under *Wexler* and *Loyd*, the Court is precluded from considering Kaplan's performance at the prima facie stage of her age discrimination claim. And Kaplan is correct that Miles testified that she was qualified for the job. (Miles Dep. 168:11–13 ("Q: And your assessment was that she was qualified for the job? A: Yes."); *see also* Doc. No. 38-10, ¶ 6 ("Mr. Miles told me that he thought Ms. Kaplan might be overqualified for the job").) Therefore, at a minimum, there is a genuine dispute of material fact as to whether Kaplan was qualified for the job. *Hudson v. Cleveland Clinic Found.*,

30

No. 1:23-cv-2182, 2025 U.S. Dist. LEXIS 70263, at *12–13 (rejecting defendant's argument, at the prima facie stage, that the plaintiff "was not qualified for her role as laboratory supervisor because she failed to perform her job at a satisfactory level") (cleaned up); *Tschappatt v. Cresent Metal Prods.*, No. 1:17-cv-337, 2019 U.S. Dist. LEXIS 61714, at *13 (N.D. Ohio Apr. 10, 2019) ("Therefore, the Court will not consider Plaintiff's disciplinary issues as evidence of his lack of qualification for his position because Defendant has stated those issues as its nondiscriminatory reason for discharge").

### b.    Plaintiff has pointed to comparators

Defendants next argue that "[i]t is undisputed that unlike the other RBMs (and, more specifically, Lake, McCumber and Runnels), Plaintiff had persistent and documented customer relationship problems. Indeed, Plaintiff cannot point to any other RBM who received similar customer criticisms, dooming comparator status and defeating her prima facie case as a matter of law." (Doc. No. 34-1, PageID #647.)  In her Opposition, Kaplan argues that "[a]fter January 2024, the Company increased the number of RBMs from 7 to 8 and hired Stephanie Weisenberger (age 53) in the Pittsburgh territory and Colleen Harrington (age 46) in a territory that included Virginia, part of Kaplan's territory." (Doc. No. 38, PageID #931.)  Kaplan also asserts that "Miles also added a 37-year-old Associate RBM, Maxxton Skore." (*Id.*)  Defendants do not respond to Kaplan's arguments in their Reply and reiterate their arguments contained in their Motion concerning comparators. (Doc. No. 40, PageID #4122.)

In age discrimination cases, the "fourth element [of the prima facie case] is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003) (citing

31

*O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311–13 (1996)).  In *Grosjean*, the Sixth Circuit directly addressed the issue of what constitutes a "significantly younger" replacement. *Id.*  In looking to sister circuits, the court determined that age differences of ten or more years generally meets the significantly younger requirement for age discrimination, while differences of less than ten years do not.  *Id.* at 336–398.  To not conflict with its prior precedent in which an eight-year difference was found to be significant, the court concluded that an age difference of six years or less, without direct evidence to the contrary, was not significant.  *Id.* at 340.

The Sixth Circuit has clarified that *Grosjean* created a "zone of discretion in age-discrimination cases involving replacement by a person who is between six and ten years younger than the plaintiff."  *Blizzard*, 698 F.3d at 284.  Thus, age differences of "six to ten years … must be considered on a case-by-case basis."  *Compare Blizzard*, 698 F.3d at 284 (finding six-and-a-half-year age difference sufficient to create material fact at summary judgment stage), *with Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 467 (6th Cir. 2014) (finding seven-year age difference insufficient to support *prima facie* case).

Here, Plaintiff argues that Stephanie Weisenberger (age 53) and Colleen Harrington (age 46) replaced her in the Pittsburgh territory.  Defendants do not dispute this and offer no argument as to why Plaintiff cannot point to these individuals to establish the fourth element of her prima facie case.  The Court therefore finds that under *Grosjean* and *Blizzard*, Weiseinberger and Harrington's age differences (8 years and 15 years respectively) are sufficient to establish a genuine dispute of material fact as to whether Kaplan was replaced by a significantly younger person.

> **ii.    Defendants have presented evidence that Kaplan's termination was based upon legitimate and non-discriminatory reasons.**

Defendants assert that that "Plaintiff's inadequate and 'disappoint[ing]' PDT support,

32

insufficient in-service trainings, rudeness, insubordination, 'broken' customer communication and inability to follow physician and Pinnacle directives were legitimate and non-discriminatory reasons to terminate her employment." (Doc. No. 34-1, PageID #648.)  Kaplan does not dispute Defendants' arguments.  And the Court agrees that Defendants proffered bases for terminating Kaplan (e.g. poor performance) are legitimate and non-discriminatory reasons to terminate her employment.  *See*, *e.g.*, *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 488 (6th Cir. 2011); *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007).

>                   **iii.    There is a genuine dispute of material fact as to whether Defendants' proffered reason for terminating Kaplan was pretextual**

Because Defendants have sufficiently articulated a legitimate, non-discriminatory reason for Kaplan's termination, the burden shifts to Kaplan demonstrate pretext.  Establishing pretext in an age discrimination case is no easy task:

> "At the pretext stage, the plaintiff's burden of production 'merges' with his ultimate burden of persuasion to show that age discrimination was the but-for cause of his termination." *Willard*, 952 F.3d at 807. *See also Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009). Meeting this causation requirement "is no simple task." *Pelcha*, 988 F.3d at 323. It requires a plaintiff to show, by a preponderance of the evidence, that "age was the determinative reason they were terminated; that is, they must show 'that age was the 'reason' that the employer decided to act.'" *Id.* at 323-324 (quoting *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014)). Stated differently, a plaintiff must show that "age '*had a determinative influence on the outcome*' of the employer's decision-making process." *Pelcha*, 988 F.3d at 324 (quoting *Gross*, 557 U.S. at 176) (emphasis in original). *See also Sloat v. Hewlett-Packard*, 18 F.4th 204, 209 (6th Cir. 2021).

*Gard v. Grand River Rubber & Plastic Co.*, No. 1:20cv125, 2021 U.S. Dist. LEXIS 243205, at *66 (N.D. Ohio Dec. 20, 2021) (Barker, J) (emphasis in original).

"Plaintiffs ordinarily show pretext 'by showing that the proffered reason[] had no basis in

33

fact; (2) was insufficient motivation for the employment action; or (3) did not actually motivate the adverse employment action." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 515 (6th Cir. 2021) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 790–91 (6th Cir. 2006)).  The "three-part test need not be applied rigidly." *Yacko v. GM Co.*, No. 1:23-cv-01578-PAB, 2024 U.S. Dist. LEXIS 232650, at *39–41 (N.D. Ohio Dec. 26, 2024) (Barker, J.) (quoting *Blizzard*, 698 F.3d at 285).  As explained by the Sixth Circuit:

> Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is. One can distill the inquiry into a number of component parts, and it can be useful to do so. But that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[A] reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason."); *Forrester*, 453 F.3d at 417 ("If [the proffered reason] is not the true ground, the employer may still be innocent of discrimination; he may for example have lied to conceal a reason that was discreditable but not discriminatory.") (citations omitted). At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial. *Hicks*, 509 U.S. at 511, 113 S. Ct. 2742. But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

*Chen*, 580 F.3d at 400, n.4.

Defendants argue that "Plaintiff predicates her age discrimination claims upon speculative and self-serving conclusions, which are insufficient to defeat summary judgment."  (Doc. No. 34-1,

34

PageID #649.)  Defendants further argue that "[n]ot only does Plaintiff fail to produce any affirmative evidence to demonstrate but-for causation, Plaintiff admits it is critical RBMs (i) fundamentally understand the PDT modality to operate the laser during PDT illuminations and to provide in-service trainings to hospitals and (ii) communicate effectively with hospitals and adhere to their directives – the very tasks she failed to execute."  (*Id.*)

Plaintiff's responds with seven arguments in her Opposition:

1.      Plaintiff asserts that "[i]t is undisputed that there is no record evidence of any actual customer complaint about Kaplan or "ban" of Kaplan that any customer communicated to Defendants." (Doc. No. 38, PageID #932.)  Plaintiff, making several specific arguments that will not be reproduced in this Opinion, asserts that "each alleged report contains fatal credibility issues, which is both evidence of pretext and undermines any claim of reasonable reliance by Defendants."  (*Id.* at PageID #935.)

2.      Pointing to the testimonies of Miles, Lake (another RBM) and Dubravka, Plaintiff argues that "Defendants' assertion that Kaplan was not a team player are evidence of pretext."  (*Id.* at PageID #940–41.)

3.      Plaintiff next asserts that Miller's claim [that Kaplan's performance was basis for termination] is baseless and that Kaplan was subjected to stricter standards than her younger peers" because "[f]ive out of seven RBMs had a slower second half, and Kaplan's performance was still the best at the end of the year." (*Id.* at PageID #941–42.)

4.      Plaintiff then argues that "Defendants cannot provide a clear answer as to when they made the decision to terminate Kaplan, which precludes summary judgment."  (*Id.* at PageID #942–43.)

35

5.      Plaintiff further argues that younger RBMs "failed to meet the Company's expectations for the primary responsibility of their role" and "they were not terminated." (*Id.* at PageID #943–44.)

6.      Plaintiff, pointing to Dubravka's testimony and her own testimony, then asserts that "Mr. Miles's preferred type of employee, as she was older than her peers, an Orthodox Jew, and foreign born, speaking with a noticeable and distinct accent." (*Id.* at PageID #944.)

7.      Plaintiff, next argues that Maxine Ashby (VP of Global HR for Advanz) concluded that "we have no evidence," when "reviewing Miles's and Miller's justification for terminating Kaplan." (*Id.* at PageID #944–45.)

Defendants do not meaningfully dispute many of Kaplan's arguments. They argue that "Plaintiff's efforts to malign Lake, Tarlton [Pinnacle's National training Manager] and Carlson [a laser support specialist for Pinnacle] and, by extension, discredit West Penn's, VCU's and UPMC's complaints about Plaintiff 'simply impugn the legitimacy of the asserted justification for [Plaintiff's] termination,' and do not establish pretext." (Doc. No. 40, PageID #4123.) According to Defendants, "Plaintiff cherry-picks Lake's, Tarlton's and Carlson's testimony to dilute the customer complaints. But at their core, Plaintiff's claims the reports are 'substantively false,' . . . are speculative and find no record support." (*Id.* at PageID #4124.) Defendants further assert that "[t]here simply is no evidence tethering Lake's, Tarlton's and Carlson's reports (or Miller's decision, for that matter) to any age or any other discriminatory animus." (*Id.*) Defendants additionally argue in their Reply that "Plaintiff misrepresents the record to fabricate an admission Defendants 'have no evidence.'" (*Id.*) Defendants then argue that two comments from Miles that Kaplan identifies "are insufficient as a matter of law." (*Id.* at PageID #4126.)

36

After careful consideration, the Court finds that there is a genuine issue of material fact as to whether Defendants' proffered basis was pretextual.

When Miles recommended to HR that they should terminate Kaplan's employment, he wrote that "I do not think she is a good fit for the team in any way, and she appears to potentially be harming the business." (Doc. No. 38-7, PageID #1169.)  He based this statement, in part, on an email from Miller detailing "multiple specific points (documentation) of unacceptable actions/behavior/feedback on Marina." (*Id.*)  These included "notes from Jacque Tarlton" and "two previous case experiences Tara Lake RBM, had, when covering Marina." (*Id.* at PageID #1170.)

Tarlton's notes detailed that (i) Lori Marshall (a laser support specialist) refused to cover cases for Kaplan "because she is difficult to deal with and extremely rude," (ii) Carlson (another laser support specialist) informed Tarlton that "the staff [at West Penn] told her that Marina is not allowed in West Penn," (iii)  Tarlton believed that Kaplan "was not a team player" based on a one-on-one call with Kaplan, and (iv) Tarlton heard from "multiple RMBs . . . that [Kaplan] is aggressive and not a team player." (*Id.* at PageID #1170.)  Lake's experiences included (i) a case at VCU where the "compliance team was present," and the staff informed Lake that Kaplan "did not handle the equipment properly" and "was unprofessional and rude," and (ii) a case at West Penn where two fellows "expressed their lack of education from the in-service given by Marina, a doctor made a comment "we are not fond of her and would rather not work with her," and they "were also displeased that Marina suggested a proctorship with a rival hospital in the area." (*Id.*)

Upon review, the Court finds that a jury reasonably could find that Miles' proffered reasons were pretextual.  First, Plaintiff has offered evidence contradicting Lake's experience with VCU. Dubravka avers in his Declaration that "Ms. Lake did not report any issues to me" and he did "not

37

recall [Lake] reporting to me anything about Ms. Kaplan's attitude or alleged rudeness, safety violations, or being banned from VCU." (Doc. No. 38-10, ¶ 18.) Further, Dubravka avers that:

> I communicated directly with Dr. Shepherd after the case. Dr. Shepherd expressed dissatisfaction to me for sending Ms. Kaplan when she was a brand new and inexperienced RBM. The difficulty during this case was not attributable to Ms. Kaplan or her abilities. Nothing Ms. Kaplan did or said created any compliance issue that was reported to the Company. *He did not report to me anything about Ms. Kaplan's attitude or alleged rudeness, safety violations, or being banned from VCU.*

(*Id.* at ¶ 21 (emphasis added).) Put simply, Dubravka and Lake give conflicting accounts as to VCU's perception of Kaplan.

Second, on January 9, 2024, Kaplan sent an email to Fizzah Ifitkhar and Maxine Ashby regarding her termination. (Doc. No. 40-11, PageID #4648.) The next day, Ifitkhar sent a draft email responding to Kaplan's email to Ashby for her review. (*Id.* at PageID #4647–48.) Ashby responded by providing edits to the email and specifically asked: "The part in yellow, is that true? We have to be really careful with that claim we have no evidence. (behavioral issues)." (*Id.* at PageID #4647.) In that email, "behavioral issues" is highlighted in yellow. (*Id.*) There is nothing in Ifitkhar's email, as revised by Ashby that is in yellow, other than a placeholder for what appears to be a date. Based on this email, it appears that Ashby is suggesting that Defendants had no evidence of any behavioral issues. At the very least, a reasonable jury could reach that conclusion.[5]

---

[5] Defendants assert that "[t]his comment from Maxine Ashby, Advanz's Vice President Global HR, referred to Miles' statement Dubravka 'protect[ed]' Plaintiff and the resultant lack of 'documentation' of Plaintiff's customer relationship issues." (Doc. No. 40, PageID #4124.) According to Defendants, "When read in its full context, Ashby's comment clearly refers to Miles' statement and is far from any admission of wrongdoing." (*Id.* at PageID #4124–25.)

Defendants' proposed construction or meaning of the email is not the only reasonable one. A jury could reasonably construe the email to mean that Ashby concluded that Defendants had no evidence of Kaplan's behavioral issues. This conclusion is further supported by Ifitkhar's response to Ashby's email. Ifitkhar responded to Ashby's "no evidence" comment with "I took it out from the feedback that Larry shared with us (attached) as indicated in the VCU and Westpenn (sic) cases." The attached email, which was sent to Ashby, is Miles' recommendation to terminate Kaplan based upon Miller's investigation. In other words, Ashby was aware of the behavioral issues forming the basis of Kaplan's

Third, Plaintiff has presented additional evidence contradicting Tarlton's notes.  Tarlton wrote that Lori Marshal refused to cover cases for Kaplan "because she is difficult to deal with and extremely rude."   But Marshall testified that she never complained about Kaplan to Tarlton. (Marshall Dep. 17:2–6 (Q: Did you, at any point in time, ever have similar conversation or report any concern or complaint or observations you had about Marina Kaplan to Jacque Tarlton? A: No).) Further, Carlson admitted that Kaplan was "not formally banned" at West Penn and allegedly learned of an "informal ban" while covering a case for, the supposedly banned, Kaplan.  (Carlson Dep. 53:2– 21.)   And Dubravka avers that Kaplan "was never 'banned' from, barred from, uninvited from, disinvited from, or otherwise requested to avoid any hospital or medical facility by any customer or potential customer of the Company."  (Doc. No. 38-10, ¶ 17.)

Moreover, Dubravka avers in his declaration that "Ms. Kaplan was professional, respectful, helpful and supportive of her peers," that "[w]hen asked, Ms. Kaplan covered clinical cases for her team members without hesitation when her work schedule permitted," and that "it would be false to say that Ms. Kaplan was not a team player." (Doc. No. 38-10, ¶¶ 13, 16.)  This, of course, contradicts Tarlton's notes indicating that Kaplan was not being a "team player." And again, the "no evidence" email does contradict Tarlton's reporting of Kaplan's alleged behavioral issues.

Finally, Plaintiff has also presented evidence that younger employees received more favorable treatment than her.  Miller testified that Kaplan's performance decline in sales "was one of the things that formed the basis for [his] recommendation of termination." (Miller Dep. 105:7–11.)  But as Kaplan points out, she met her sales goal in 2023, but three younger RBMs did not meet their sales

termination when she made the "no evidence" remark.  A reasonable jury could conclude that Ashby's "no evidence" comment was made with full knowledge of Miles' email detailing the alleged behavioral issues.

39

goal.  (Doc. No. 39–2, PageID #2533–2537.)  Indeed, even though Kaplan's sales decreased in the second half of 2023, she still sold more vials than those same younger RBMs during the same time.  (*Id.*)  And Miller testified that he knew that "the majority [of RBMs] were trending down."  (Miller Dep. 45:21–46:3.)  Yet, Defendants never terminated the other underperforming RBMs or considered putting them on a performance improvement plan.  (Miller Dep. 65:1–66:15.)

Given that none of the younger RBMs were disciplined for their declining sales, and Kaplan has produced evidence showing that Defendants proffered justification had no basis in fact, the Court finds that the Court finds that a jury could reasonably conclude that Kaplan was terminated based upon her age.  For all these reasons, the Court finds that the question of whether Kaplan's termination was pretextual is a question best left for the jury.

### iv. There is genuine issue of material fact as to whether Pinnacle and Advanz can rely on the honest belief rule

Although the Court has found that pretext is a jury question, Defendant may still be able avoid liability under the honest belief rule.  In their Reply brief, Defendants specifically assert that "the salient inquiry is whether the employer has an 'honest belief' in its termination decision."  (Doc. No. 40, PageID #4125.)  Quoting an out-of-circuit decision from 1987, Defendants assert "[i]f [an employer] honestly explain[s] the reasons behind [its] decision, but the decision was ill-informed or ill-considered, [the] explanation is not a 'pretext.'"  (*Id.* (quoting *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559 (7th Cir. 1987)).)  And under this rule, Defendants argue that "the record evidence chronicling Pinnacle's decision to terminate Plaintiff is sound and unequivocal" because (i) "[u]pon Miller's hire in November 2023, Miles informed Miller about Plaintiff's customer relationship problems and directed him to 'dig into it, make an assessment of what you think. . .'", (ii) "[i]n December 2023, Miller learned about Plaintiff's persistent customer relationship problems and her

40

steep sales decline," and (iii) "on December 27, 2023, Miller recommended to Miles [that] Pinnacle terminate Plaintiff immediately, and Miles concurred." (*Id.* at PageID #4125–26.) According to Defendants, "there is no evidence at all to dispute Miller's honest belief." (*Id.* at PageID #4126.)

The Court does not find that the honest belief rule mandates summary judgment here. As this Court previously explained:

> Under the "honest belief" rule "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir.2009) (internal quotation marks omitted). "An employer's pre-termination investigation need not be perfect in order to pass muster under the rule." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591 (6th Cir. 2014) (citing *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)). "The key inquiry is instead 'whether the employer made a reasonably informed and considered decision before taking an adverse employment action.'" *Id*. (quoting *Seeger*, 681 F.3d at 285).

*Immormino v. Lake Hosp. Sys., Inc*., 127 F. Supp. 3d 829, 837 (N.D. Ohio 2015). "If there is sufficient evidence for a reasonable jury to find the employer did not have an honest belief in its proffered reason that was based on a proper investigation, summary judgment must be denied." *Briggs*, 11 F.4th at 515. And the Sixth Circuit has cautioned that this rule only applies to a "no-basis-in-fact" pretext argument. *Id.* Stated succinctly, "the honest-belief rule gives a defendant the opportunity to rebut a plaintiff's third-step argument that the defendant's proffered reason for the adverse action lacks a basis in fact and is therefore pretextual." *Id*.

The Court finds that there is sufficient evidence for a reasonable jury to find that Defendants did not have an honest belief when terminating Kaplan. To fall within the honest-belief rule's protection, the investigation process does not need to be perfect, but the employer must make "a reasonably informed and considered decision before taking an adverse employment action." *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1030 (6th Cir. 2010) (quoting *Smith v. Chrysler Corp.*, 155 F.3d

41

799, 806–07 (6th Cir. 1998)).   Put simply, as explained above, a reasonable juror could find that Defendants' own HR department did not believe that they had evidence of Kaplan's behavioral issues, which formed the basis for her termination.  The Court therefore finds that the application of the honest belief rule is a question for the jury.  Therefore, the Court declines to grant summary judgment to Advanz and Pinnacle on Plaintiff's age discrimination claim.

### 5. Pinnacle and Advanz are entitled to summary judgment on Plaintiff's sex/gender discrimination claims

In their Motion, Defendants argue that "Plaintiff's gender discrimination claims are speculative and fail at the prima facie stage" because "she cannot identify comparators whom Defendants treated more favorably." (Doc. No. 34-1, PageID #650.)  They assert that "[j]ust as with her age discrimination claims, Plaintiff's undisputed customer complaints (i.e., from VCU, West Penn and UPMC) foreclose comparator status." (*Id.* at PageID #651.)  Defendants also argue that Kaplan cannot establish pretext because "Plaintiff admitted: (i) Defendants preferentially treated other women . . . and (ii) Pinnacle hired a woman to assume her RBM Role." (*Id.* at PageID #652.)  They further argue that "[b]eyond that, Plaintiff concludes Pinnacle retained two male RBMs, Runnels and McCumber, not because they are men, but because they are handsome and physically attractive, further belying her claim of gender animus and defeating her claims as a matter of law. (*Id.*)

In her Opposition, Kaplan argues that she "has presented evidence that she suffered more severe treatment than McCumber and Runnels, RBMs whose performance was worse." (Doc. No. 38, PageID #948.)  She asserts that "Defendants will argue that Kaplan was replaced by women," but argues that "[t]his might undermine Kaplan's claims, were it not for the sexually charged work environment in which Kaplan worked. Kaplan experienced being excluded because she was not as

42

physically attractive and 'sexually appealing,' as her female peers." (*Id.*) According to Kaplan, "Miles's behavior included acting attracted to Lake, Jedd, Sobeleskie, becoming intoxicated at work events, touching them, and groping them." (*Id.*) Kaplan, quoting her own deposition testimony, then claims that during a national sales meeting: "[t]hey got drunk with [Miles]. They tolerated - he was touching them inappropriately. Inappropriately sexually charged jokes and comments…. so when I see activity, -- behavior like this, very unprofessional behavior, where those ladies -- …behaving this way, I would excuse myself. Because I'm not a drinker. And it was offensive to me personally… So I was a team player. I am a team player. But when I see something which crosses this line, as a woman I feel insulted." (*Id.* at PageID #948–49.) And Kaplan points to text messages from other RMBs that include messages like: "Milan, you manage a bunch of degenerates," "I stuck close to you girls all night! It was to keep you away from retards like that guy!," "I need a drink refill," "We miss you so much we want you to bring us drinks," "Yes tequila," "stand up for the Viagra man!," "Let's go old balllllllls." (*Id.* at PageID #949.) Kaplan also asserts that "in the same exchange, RBM Sloan sent a closeup photo of Jedd's breasts with commentary, and a photo of Miles slumped on a street corner after a night out, writing 'I found Larry. . .. He won't get up.'" (*Id.*) Kaplan concludes that "[r]efusal to participate in a sexually toxic work environment may constitute sex-based discrimination under Title VII, even if the participation was voluntary and not mandatory." (*Id.*)

In their Reply, Defendants, with respect to Plaintiff's prima facie case, argue that "there simply is no evidence McCumber, Runnels and/or Lake are actual comparators" because "Plaintiff conveniently bypasses the undisputed fact Plaintiff was the only RBM with customer relationship problems and that Pinnacle filled the RBM Role vacancy with another female." (Doc. No. 40, PageID #4127.)

43

Even assuming Plaintiff can establish a prima facie case, the Court finds that Kaplan has not presented sufficient evidence to establish pretext based upon sex.  Kaplan does not rely on the same evidence to establish pretext as she did for her age discrimination claim.  Indeed, in Kaplan's Opposition, the word pretext does not appear in her section concerning her sex discrimination claims.  Kaplan does argue that "[a] jury reasonably could conclude that Kaplan's refusal to participate in Defendants' sexually charged work environment was precisely what Miles meant by 'not a good fit,' and a violation of Title VII."  (Doc. No. 38, PageID #949.)  As proof of this "sexually charged work environment," Kaplan points to her own testimony and text messages exchanged between RBMs.  Assuming Kaplan is asserting that this evidence establishes pretext, the Court disagrees.

First, the test messages are insufficient to establish a sexually charged/hostile work environment.  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (internal quotations omitted); *Braun v. Ultimate Jetcharters, Inc.*, No. 5:12-cv-01635, 2013 U.S. Dist. LEXIS 104277, at *37–38 (N.D. Ohio July 25, 2013) (granting summary judgment hostile work environment claim based on "infrequent and isolated incidents that were not severe").  Put simply, an exchange of unsavory text messages is insufficient to establish a hostile work environment.  Without the text messages, Kaplan's argument is hinged upon her testimony of how she perceived her work environment.  But Kaplan's testimony, standing alone, is insufficient to establish a sexually charged work environment.  "[M]ere personal beliefs, conjecture and speculation are insufficient to support an inference" of discrimination.  *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986); *Hightower v. Keystone Auto. Indus.*, 653 F. Supp. 3d 420, 431 (N.D. Ohio 2023) ("This final theory, which relies

44

on pure conjecture and speculation without a shred of probative evidence to substantiate it, is woefully insufficient to generate a genuine issue of material fact on the subject of pretext").

Kaplan's perception and the text messages, even taken together, are insufficient to establish a hostile work environment. *See Kellar v. Yunion, Inc.*, 157 F.4th 855, 872 (6th Cir. 2025) (finding that establishing a hostile work environment is "a high bar"); *see also Vinsant v. WNB Grp. LLC*, No. 25-3228, 2026 U.S. App. LEXIS 503, at *7 (6th Cir. Jan. 7, 2026) ("inappropriate comments about [the plaintiff's] appearance" that happened between "10 to 100 times over a 2.5-year period" insufficient to sustain a hostile work environment claim); *Amini v. Rite Aid Corp.*, 819 F. App'x 344, 349 (6th Cir. 2020) ("A handful of harsh age-based comments hardly makes a work environment hostile under the law"); *Clay v. UPS*, 501 F.3d 695, 707–08 (6th Cir. 2007) (fifteen racially-motivated comments and instances of disparate treatment over a two-year period were isolated, not pervasive, and therefore not actionable under Title VII). For these reasons, the Court finds that Defendants are entitled to summary judgment on Plaintiff's gender discrimination claims.

### 6. Defendants are not entitled to summary judgment on Kaplan's National origin and religious discrimination claims

Defendants are not entitled to summary judgment on Plaintiff's claim of national origin and religious discrimination.  Defendants argue that Kaplan's national origin and religious discrimination claims fail at the prima facie stage because "the record evidence -- demonstrating Plaintiff was the only RBM with documented and persistent customer relationship problems -- is comprehensive and unequivocal" and because Kaplan "concedes she does not know whether Defendants actually knew the religions or national origins of the RBMs."  (Doc. No. 34-1, PageID #652.)  As to pretext, Defendants argue that "Plaintiff resorts to speculation and surmise, concluding that because she is Ukrainian and because she is Jewish, these characteristics necessarily motivated Pinnacle's decision

45

to terminate her employment." (*Id.* at PageID #653–54.)

In her Opposition, Kaplan argues that "(1) there is no dispute that she is an Orthodox Jew and of Ukrainian origin; (2) she was qualified; (3) she was terminated; and (4) replaced by individuals not known to be Orthodox Jews or of Ukrainian origin, and treated less favorably than similarly situated peers." (Doc. No. 38, PageID # 949.)  Without citing any authority, Kaplan argues that "she need only show that Defendants do not view [the individuals who replaced Kaplan] to be in the same protected class as Kaplan." (*Id.* at PageID #950.)  As to pretext, Kaplan argues that she "establishes pretext in the same manner as" her age discrimination claim.  (*Id.*)  Kaplan, relying solely on Dubravka's deposition testimony also argues that "Kaplan's peers, some of whom made complaints about Kaplan, did not like Kaplan's absence from work for religious reasons." (*Id.*)

In their Reply, as to her prima facie case, Defendants make the same arguments that they made in their Motion.  As to pretext, Defendants argue that "Plaintiff admits 'Miles summarily approved Dubravka's decision [to hire Plaintiff] without questions, after a voice call with Kaplan,' which Plaintiff concedes would reveal her 'pretty heavy accent' and make 'very clear English is not [her] first language.'" (Doc. No. 40, PageID #4130.)  They further argue that Kaplan "further admits Tarlton extended sympathy to Plaintiff and her Ukrainian counterparts regarding the Ukraine/Russia war." (*Id.*)  Defendants next argue that "it is undisputed (and Plaintiff admits) Pinnacle provided her with religious accommodations to attend Jewish holiday observances." (*Id.*)

To establish a prima facie case of religious/national origin discrimination using circumstantial evidence, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was replaced by a person outside the protected class or treated differently than similarly situated non-protected

employees.  *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) (religious discrimination); *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007) (national origin discrimination).  Defendants only attack the fourth element.  But a reasonable juror could find that Kaplan was "treated differently than similarly situated non-protected employees."  As explained above, the Court has already found that there is an issue of fact as to Kaplan's alleged behavioral issues that Defendants claim were the basis for her termination.  And other non-Jewish/Ukrainian RMBs[6] performed worse than Kaplan and were not terminated.  Pretext is also a jury question because Kaplan is relying upon the same evidence of pretext as her age discrimination claim. In sum, Defendants are not entitled to summary judgment on Plaintiff's religious/national origin claims.

### 7.  Pinnacle and Advanz are entitled to summary judgment on Kaplan's wrongful discharge claim

Under Ohio law, at-will employment "is terminable at the will of either party for any cause or no cause."  *House v. Iacovelli*, 152 N.E.3d 178, 181 (Ohio 2020) (citing *Collins v. Rizkana*, 652 N.D.3d 653 (Ohio 1995)).  The tort of termination in violation of public policy is an exception to this rule.  *Id.* (citing *Greeley v. Miami Valley Maintenance Constrs.*, 552 N.E.2d 981 (Ohio 1990)).  The elements of the tort are:

> 1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
>
> 4. The employer lacked overriding legitimate business justification for the

---

[6] Despite Defendants arguments, Dubravka avers in his Declaration that "Ms. Kaplan was also the only RBM who was not born in the United States of America and the only RBM who practiced Orthodox Judaism."  (Doc. No. 38-10, ¶ 7.)

dismissal (the *overriding justification* element).

*Allman v. Walmart, Inc.*, 967 F.3d 566, 574 (6th Cir. 2020) (quoting *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003)) (emphasis in original).   The "clarity" and "jeopardy" elements are questions of law for the court to decide.  *House*, 152 N.E.3d at 181 (citing *Collins*, 652 N.E.2d at 658).

In their Motion, Defendants argue that that Plaintiff cannot establish the clarity element because Kaplan's "generic claims [related to off label cases] fail to implicate and are entirely untethered to [] public policies."  (Doc. No. 34-1, PageID #655.)  And with respect to the jeopardy element, Defendants argue that "[t]here is no evidence Plaintiff complained to vindicate a public right -- about the promotion of PHOTOFRIN® for off-label use or otherwise."  (*Id.* at PageID #656.) According to Defendants, "Plaintiff's complaints implicated only her self-interest, which cannot sustain the Jeopardy Element."  (*Id.*)  Defendants further argue that "[n]or can Plaintiff satisfy the third and fourth requisite elements, which require a pretext showing like that espoused under *McDonnell Douglas*."  (*Id.* at PageID #656–57.)

In her Opposition, Kaplan argues that she "has identified multiple sources of public policy establishing the clarity element" by pointing to 21 U.S.C. § 355, 21 U.S.C. § 331(a)–(d) and 21 C.F.R. § 201.128.  (Doc. No. 38, PageID #945.)  As to the Jeopardy element, Kaplan argues (i) that "[t]o prevent RBMs from promoting off-label pharmaceutical use, it is necessary for individuals asked to engage in such conduct to object to it, (ii) that "Kaplan did this, making it clear she was opposed to violating FDA regulations," and (iii) that "it should be undisputed that terminating an employee who objects to promotion of off-label pharmaceuticals is likely to discourage others from making the same complaint."  (*Id.* at PageID #947.)  Responding to Kaplan's jeopardy arguments, Defendants argue

48

in their Reply that "Plaintiff doubles down on the individual interests her purported reports contemplated, which is fatal to the Jeopardy Element." (Doc. No. 40, PageID #4132.)

The Court agrees with Defendants that Plaintiff cannot satisfy the jeopardy element. The Sixth Circuit has interpreted the jeopardy element as follows:

> although complaining employees do not have to be certain that the employer's conduct is illegal or cite a particular law that the employer has broken, the employee must at least give the employer clear notice that the employee's complaint is connected to a governmental policy. It must be sufficiently clear from the employee's statements that he is invoking governmental policy that a reasonable employer would understand that the employee relies on the policy as the basis for his complaint.

*Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 656 (6th Cir. 2005). To determine whether an employee has satisfied the jeopardy element, the Sixth Circuit has instructed district courts to "(1) determine what kind of conduct is necessary to further the public policy at issue; (2) decide whether the employee's actual conduct fell within the scope of conduct protected by this policy; and (3) consider whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal." *Allman v. Walmart, Inc.*, 967 F.3d 566, 574 (6th Cir. 2020). But to sustain the jeopardy element, the Sixth Circuit has explained "that the employee must at least have made clear to his employer that he is invoking a governmental policy as the basis for his complaint, not just his own self-interest." *Jermer*, 395 F.3d at 659; *accord Coldly v. Fuyao Glass Am., Inc.*, 191 N.E.3d 514, 525 (Ohio App. 2d Dist. 2022) ("While the Supreme Court of Ohio has not specifically commented on this point, several Ohio appellate districts agree with *Jermer*").

Here, Defendants only challenge the second prong of the jeopardy analysis—that Kaplan's actual conduct did not fall within the scope of conduct protected by this policy. Specially, they argue that, under *Jermer*, Kaplan was acting in her own self-interest. The Court agrees. Kaplan testified

49

that when she reported off-label cases to Miles, she was doing so in her own self-interest:

> Q:  I'm talking about what concerns you relayed to [Miles] about the promotion of Photofrin for off-label uses?
>
> A:  *That I should not be involved in those communications.*  And the company had no system to differentiate between what's on-label.  We talk (sic) about it.  Salesforce, I mentioned previously, had no way of differentiating off-label versus commercial vials.
>
> * * *
>
> Q:  So that you - - so you told Larry, I shouldn't be receiving any communications about off-label?
>
> A:  Yes.
>
> Q:  Okay.
>
> A:  Off-label, clinical studies, anything to do with medical affairs.
>
> Q:  Okay.
>
> A:  Any questions clinicians are asking me, *I should not be involved*.  And I wanted to know who should I direct them to.
>
> * * *
>
> Q:  So other than what you've just described to me, did you report to any other Pinnacle employee that sales representatives were promoting Photofrin for off-label uses?
>
> A:  Primarily Larry.  *And I was talking about myself, that I should not be involved in this*.

(Kaplan Dep. 388:11–19, 415:12–22, 416:11–17.)  Plaintiff has not directed the Court to any testimony showing that she was invoking any government policy concerning the alleged off-label uses.  Instead, the above testimony establishes that Kaplan did not personally want to be involved with the alleged off-label uses, and was not concerned with whether other employees were involved with off-label uses.  *Katib v. USF Holan LLC*, 640 F. Supp. 3d 788, 792 (N.D. Ohio 2022) (holding

50

plaintiff did not sufficiently allege the jeopardy element because "his allegations suggest that he personally did not want to drive the truck"); *Quillen-Smith v. United States Bank, N.A.*, No. 3:20-cv-364, 2021 U.S. Dist. LEXIS 60637, at *7 (S.D. Ohio Mar. 30, 2021) (holding plaintiff did not sufficiently allege the jeopardy element because her complaints "related only to her own self-interest and that of her unborn child" and did "not implicate any other employees"); *Beckloff v. Amcor Rigid Plastics USA, LLC*, 93 N.E.3d 329, 341 (Ohio App. 6th Dist. 2017) ("There is no evidence that Beckloff put Amcor on notice that he was attempting to invoke a governmental policy and not simply his own self-interest. Summary judgment in favor of Amcor was therefore, appropriate"). Thus, under *Jermer*, Pinnacle and Adavanz are entitled to summary judgment on Plaintiff's wrongful discharge claim.

## V.  Conclusion

For the reasons set forth herein, the Motion to Strike is granted in part and denied in part as follows.  The Court strikes Paragraph 30 of Dubravka's Declaration and denies the Motion to Strike in all other respects.  Defendants' Motion is granted in part and denied in part as follows.  The Court grants summary judgment in favor of Concordia on all of Plaintiff's claims against it.  The Court grants summary judgment in favor of Advanz and Pinnacle on Plaintiff's sex discrimination claims and wrongful discharge claim.  The Court denies summary judgment in favor of Advanz and Pinnacle on Plaintiff's age discrimination claims and national origin/religious discrimination claims.

**IT IS SO ORDERED.**

 s/Pamela A. Barker
PAMELA A. BARKER
U. S. DISTRICT JUDGE

Date:  June 23, 2026

51